Saulo Santiago, Esq.
Counsel for the Petitioner
National Labor Relations Board
Region 22
20 Washington Place, 5th Floor
Newark, New Jersey 07102
Telephone:  (862) 229-7057
SXS-7969
Saulo.Santiago@nlrb.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

DAVID E. LEACH III,
Regional Director of Region 22
of the National Labor Relations
Board for and on behalf of the
National Labor Relations Board,

         Petitioner,                                  :

       v.                                                     Civil No.  17-cv-
                                                   :
MHA, LLC d/b/a MEADOWLANDS                     :
HOSPITAL MEDICAL CENTER,

         Respondent.

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PETITION FOR PROTECTIVE RESTRAINING ORDER
UNDER SECTION 10(j) OF THE NATIONAL LABOR
RELATIONS ACT, AS AMENDED**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT   2

I.     STATEMENT OF THE CASE.   3

II.     ISSUES PRESENTED.   4

III.    THE STATUTORY SCHEME PURSUANT TO WHICH THIS
PROTECTIVE RESTRAINING ORDER RELIEF IS SOUGHT   5

    A.     The Role of the District Court   5

        1.     The "Reasonable Cause" Standard.   6

        2.     The "Just and Proper" Standard.   7

IV.    APPROPRIATENESS OF PROTECTIVE RESTRAINING ORDER IN THE
INSTANT MATTER.   8

    A.     STATEMENT OF FACTS.   8

        1.     Background.   8

        2.     Respondent Signs Asset Purchase Agreement to Sell
            Meadowlands Hospital Medical Center.   10

        3.     Administrative Law Judge Decision Finds that Respondent
            Violated the Act   11

        4.     Respondent's Refusal to Provide Documents or Set Aside
            Sufficient Funds   12

V.     ARGUMENT   13

    POINT I.     PETITIONER HAS REASONABLE CAUSE TO BELIEVE
               THAT RESPONDENT VIOLATED SECTION 8(a)(1) AND
               (5) OF THE ACT.   13

    POINT II.    INJUNCTIVE RELIEF IS JUST AND PROPER.   16

VI.    CONCLUSION.   20

## TABLE OF AUTHORITY

**Cases**

*Aguayo v. Chamtech Service Center,*
  157 LRRM 2299 (C.D. Cal. 1997).                                                  .20

*Blyer v. Unitron Color Graphics of New York Inc.,*
  1998 WL 1032625 (E.D.N.Y. 1998).                                                 .19

*Chester v. Grane Healthcare Co.,*
  666 F.3d 87 (2011).                                                        .5, 6, 7, 16

*Daikichi Corp.,*
  335 NLRB 622 (2001).                                                             .14

*Deckert v. Independence Shares Corp.,*
  311 U.S. 282 (1940).                                                             .18

*Eisenberg v. Hartz Mountain Corp.,*
  519 F.2d 138 (3rd Cir. 1975).                                                     .5

Eisenberg v. Honeycomb Plastics Corp.,
  1987 WL 109093 (D.N.J. 1987).                                                  .7, 14

*Eisenberg v. Lenape Products, Inc.,*
  781 F.2d 999 (3rd Cir. 1986).                                                   .7, 8

*Eisenberg v. Tubari,*
  1985 WL 32832 (July 8, 1985 D.NJ).                                               .14

*Eisenberg v. Wellington Hall Nursing Home, Inc.,*
  651 F.2d 902 (3rd Cir, 1981).                                                   .6, 7

Fuchs v. Hood Industries Inc.,
  590 F.2d 395 (1st Cir. 1978).                                                     .7

*Golden State Bottling Co. v. NLRB,*
  414 U.S. 168 (1973).                                                          .13, 14

Gottfried v. Frankel,
  818 F.2d 485 (6th Cir. 1987).                                                     .7

Hirsch v. Dorsey Trailers Inc.,
  147 F. 3d 243 (3rd Cir. 1998).                                                    .5

*Jensen v. Chanitech Service Center,*
  155 LRRM 2058 (C.D. Cal. 1997).                                                  .20

*Kendellen v. Evergreen America Corporation,*
  428 F. Supp. 2d 243 (D.N.J. 2006).                                             .6, 7

*Kobell v. Menard Fiberglass Products, Inc.,*
  678 F. Supp. 1155 (W.D. Pa 1988).                                         .7, 16, 17, 20

Kobell v. Suburban Lines, Inc.,
  731 F.2d 1076 (3rd Cir. 1994).                                                .passim

*Maram v. Alle Arecibo Corp.,* 1982 U.S. Dist. LEXIS 13289, 110 LRRM 2495 (D. P.R. 1982).   .17, 18

NLRB v. Denver Building Construction Trades Council,
  341 U.S. 675 (1951).                                                              .7



*NLRB v. Electro-Voice, Inc.,*
   83 F.3d 1559 (7th Cir. 1996). ............................................................ .20

*NLRB v. Kellburn Mfg.,*
   149 F.2d 686 (2nd Cir. 1945). ............................................................ .18

*NLRB v. Rosedale Fabricators, LLC,*
   *175* LRRM 2297 (5th Cir. 2004). ..................................................... .20

*Norton v. New Hope Industries, Inc.,*
   119 LRRM 3086 (M.D. La. *1985)* ..................................................... .20

*Pascarell v. Alpine Fashions,*
   126 LRRM 2242 (D. N.J. 1987). ....................................................... .16

*Pascarell v. Alpine Fashions, Inc.,*
   126 LRRM 2242 (D. N.J. 1987). ....................................................... .20

*Pascarell v. Gitano Group, Inc.,*
   730 F. Supp. 616 (D.N.J. 1990). .......................................................... .6

Pascarell v. Vibra Screw, Inc.,
   904 F. 2d 874 (3d Cir. 1990). .................................................. .5, 6, 7, 8

*Schaub v. Brewery Products,*
   715 F. Supp. 829 (E.D. Mich. 1989). ..................................... .17, 18, 20

Schauffler v. Highway Truck Drivers, Local 107,
   292 F. 2d  (3rd Cir. 1956). ................................................................... .7

Schauffler v. Local 1291, International Longshoremen's Ass'n,
   292 F. 2d 182 (3rd C*ir. 1961)* .............................................................. .7

## Statutes

29 U.S.C. § 158(a)(1). ......................................................................... .14

29 U.S.C. § 158(a)(3). ......................................................................... .14

29 U.S.C. § 158(a)(5). ......................................................................... .14

29 U.S.C. § 160(a), (b), and (c). .............................................................. .5

29 U.S.C. § 160(e) and (f). ...................................................................... .5

29 U.S.C. § 160(j). .................................................................................. .3

## SUMMARY OF ARGUMENT

The Petitioner seeks a protective order enjoining and restraining MHA, LLC d/b/a Meadowlands Hospital Medical Center, ("Respondent"), from dissipating its assets unless it sequesters the funds necessary to satisfy its potential backpay and fringe contributions liability for the adjudicated violations of Section 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), pending final administrative disposition. Specifically, the Petitioner seeks a preliminary injunction requiring that Respondent sequester approximately $3.5 million for potential monetary liability and issuance of an Order preventing Respondent from dissipating its assets.

This Court is asked to find that the Petitioner has reasonable cause to believe that Respondent engaged in unlawful activity as alleged in the First Amended Consolidated Complaint and found by the administrative law judge's decision, attached to the instant Petition for a Protective Restraining Order as Exhibit 12.

This Court is also asked to find that the interim relief sought by the Petitioner is just and proper to protect the rights of employees to engage in union activities; to preserve the status quo pending the issuance of a final Board Order in the underlying litigation; and to prevent Respondent from engaging in acts and conduct that will unavoidably result in immediate and irreparable injury to the policies of the Act and to the affected employees of Respondent.

2

## I.    STATEMENT OF THE CASE

In this proceeding, the Petitioner, the Regional Director of Region 22 of the National Labor Relations Board[1] ("the Board"), pursuant to Section 10(j) of the National Labor Relations Act, as amended, ("the Act"),  29 U.S.C. § 160(j), petitions this district court for temporary injunctive relief pending the Board's final disposition of this matter. This Memorandum is submitted in support of the Petition.

On September 30, 2013, the Acting Regional Director for Region 22, issued an Order Consolidating Cases, First Amended Complaint and Notice of Hearing pursuant to Section 10(b) of the Act, upon unfair labor practice charges filed between August 8, 2012 and August 26, 2013, by Health Professional and Allied Employees, AFL-CIO ("the Union"), in Cases 22-CA-086823, 22-CA-089716, 22-CA-090437, 22-CA-091025, 22-CA-091521, 22-CA-092061, 22-CA-096650, 22-CA-097214, 22-CA-099492, 22-CA-100324 and 22-CA-106694 against MHA, LLC d/b/a Meadowlands Hospital Medical Center ("Respondent").   In the First Amended Consolidated Complaint, the Acting Regional Director alleges that the Respondent has engaged in unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.

The Board hearing on the unfair labor practices alleged in the First Amended Consolidated Complaint commenced before an administrative law judge of the Board on December 10, 2013 and concluded on May 27, 2016.  On September 20, 2016, the administrative law judge issued his decision finding Respondent violated Section 8(a)(1) and (5) as more fully described below.  Respondent and the Union filed exceptions to the administrative law judge's decision and the instant matter is pending before the Board.

## II.    ISSUES PRESENTED

1.    Does the Petitioner have reasonable cause to believe that Respondent violated Section 8(a)(1) of the Act by threatening its employees with closure of its Rehabilitation Unit if employees engaged in protected activity and violated Section 8(a)(5) of the Act by (1) selecting employees to be laid off without affording the Union an opportunity to bargain; (2) assigning Service Unit work to non-unit per diem employees without prior notice and an opportunity to bargain; (3) failing and refusing to produce to the Union the DNV Inspection Report and information concerning Veritas; (4) unilaterally eliminating RN and Technical Unit 12-hour shifts; (5) failing to continue in effect all the terms and conditions of the RN contract by refusing to apply the RN contract to RN interns; (6) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by refusing to make contributions to employees' 401(k) pension plan; (7) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by failing to allow Union representatives to meet with employees in the Hospital's cafeteria; (8) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by failing to offer bumping and recall rights to laid off employees; (9) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by refusing to apply the Service contract to the Hospital Assistants; and (10) failing to continue in effect all of the terms and conditions of the Service contract by refusing to apply the Service contract to the Nursing Assistant interns?

2.    Is a protective restraining order enjoining and restraining, Respondent from dissipating its assets unless it sequesters the funds necessary to satisfy a potential Board

---

[1] Region 22 of the National Labor Relations Board encompasses Northern and Central New Jersey.

monetary award "just and proper" to prevent immediate and irreparable injury to the policies of the Act and to the affected employees of Respondent?

## III.   THE STATUTORY SCHEME PURSUANT TO WHICH THIS PROTECTIVE RESTRAINING ORDER RELIEF IS SOUGHT

Section 10(j) of the Act[2] authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings.[3] This provision of the statute reflects congressional recognition that the Board's administrative proceedings are often protracted.[4] As a result, absent interim relief, in many instances a Respondent could accomplish its unlawful objective before being placed under any legal restraint and thereby render a final Board order ineffectual.[5]



### A.   The Role of the District Court

A District court's role in these injunctive proceedings is limited to making two determinations: (1) whether there is "reasonable cause" to believe that unfair labor

---

[2] Section 10(j) provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States within any district wherein the unfair labor practices in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

[3] In the Third Circuit, Section 10(j) injunctive relief is to be effective for a period of time not to exceed six months or until the Board's Administrative Law Judge issues a Decision and Recommended Order, whichever occurs first, and may be extended for an additional period of time, not to exceed six months, or until the Board issues its Decision and Order, whichever occurs first. *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 144 (3rd Cir. 1975). The Circuit has stated further that these six-month limitations shall not preclude a district judge from extending the life of any Section 10(j) injunction for an additional thirty-day period upon a showing that administrative action on the underlying controversy seems to be imminent. Id.

[4] Upon the filing of unfair labor practice charges, the Board is authorized to issue, hear and adjudicate complaints that employers or labor organizations have engaged in unfair labor practices as defined by the Act. 29 U.S.C. § 160(a), (b), and (c). A Board Decision and Order is not self-enforcing. No sanctions are available until the Order is enforced after review by a Court of Appeals under Section 10(e) and (f) of the Act. 29 U.S.C. § 160(e) and (f).

[5] See *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92-93 (2011); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 n. 25 (3rd Cir. 1994), (citing Senate Rep. No. 105, 80th Cong., 1st Session, at pp. 8, 27 (1947) reprinted at I Legislative History of the Labor Management Relations Act of 1947 414, 433 (Government Printing Office 1985)). Accord, *Hirsch v. Dorsey Trailers Inc.*, 147 F. 3d 243, 246 (3rd Cir. 1998); *Pascarell v. Vibra Screw, Inc.*, 904 F. 2d 874, 878 (3d Cir. 1990).

practices have been committed, and (2) that the injunctive relief sought is "just and proper."[6] The Third Circuit has described the burden faced by the Board in seeking 10(j) relief as "relatively insubstantial."[7]

### 1. The "Reasonable Cause" Standard

Because injunction proceedings under Section 10(j) are ancillary to an administrative unfair labor practice case, and any relief granted in such proceedings expires upon the Board's final decision, the District Court is not called upon, indeed is not empowered to decide the merits of the underlying unfair labor practice case nor is the Regional Director required to adduce evidence sufficient to prove a violation.[8] Rather, in determining whether there is reasonable cause to believe that the Act has been violated, the Regional Director must meet a "low threshold of proof."[9] The "reasonable cause" standard requires the district court to find:  (1) that the Regional Director's case depends upon a substantial, non-frivolous legal theory, implicit or explicit, and (2) that there is sufficient evidence, taking the facts favorably to the Board, to support that theory.[10]

The district court should not attempt to resolve disputed facts or determine the credibility of witnesses.[11] The district court's sole function in this regard is to determine whether the Board could ultimately resolve any contested factual issues raised by the

---

[6] *Chester v. Grane*, 666 F.3d at 98-99; *Pascarell v. Vibra Screw*, 904 F.2d at 877; *Kobell v. Suburban Lines*, 731 F.2d at 1084 (interim relief under Section 10(j) may be granted without showing irreparable harm or a likelihood of success on the merits, the ordinary requisites for an injunction).

[7] *Chester v. Grane*, 666 F.3d at 98; *Kobell v. Suburban Lines*, 731 F.2d at 1084; *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d 243, 250 (D.N.J. 2006).

[8] *Kobell v. Suburban Lines*, 731 F.2d at 1083-1084; *Pascarell v. Gitano Group, Inc.*, 730 F. Supp. 616, 620 (D.N.J. 1990); *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3rd Cir, 1981); *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d at 250.

[9] *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d at 906; *Kobell v. Suburban Lines*, 731 F.2d at 1084

[10] *Chester v. Grane*, 666 F.3d at 98; *Kobell v. Suburban Lines*, 731 F.2d at 1084; *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d at 250.

6

evidence presented in favor of the Petitioner.[12]  The ultimate determination with respect

to both issues of fact and law, is reserved exclusively to the Board, subject to review by

the courts of appeal pursuant to Section 10(e) and (f) of the Act.[13]

 2.  The "Just and Proper" Standard

 In the Third Circuit, injunctive relief is just and proper:

> "[W]here the passage of time reasonably necessary to adjudicate the case on
> its merits convince[s] both the Board and the federal courts that the failure to
> grant such relief might dissipate the effective exercise of the Board's
> ultimate remedial power.[14]  By fashioning Section 10(j), Congress provided
> for interim relief in a situation in which the Board and courts believe that it is
> necessary to preserve the effective exercise of such remedial power."

*Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3rd Cir. 1986) (citations

omitted); *Kobell v. Menard Fiberglass Products, Inc.*, 678 F. Supp. 1155, 1166 (W.D. Pa

1988).

 Injunctive relief is further appropriate "when the nature of the alleged unfair labor 

practices are likely to jeopardize the integrity of the bargaining process and thereby make

it impossible or not feasible to restore or preserve the status quo pending litigation."[15]

The critical determination for the court is "whether, absent an injunction, the Board's

ability to facilitate peaceful management-labor negotiation will be impaired."[16]  An

injunction is appropriate when a failure to grant interim relief likely would "prevent the

---

[11] *Gottfried v. Frankel*, 818 F.2d 485, 493-494 (6th Cir. 1987); *Schauffler v. Local 1291, International Longshoremen's Ass'n*, 292 F. 2d 182, 186 n.4 (3rd Cir. 1961);  *Eisenberg v. Honeycomb Plastics Corp.*, 1987 WL 109093, *4 (D.N.J. 1987); *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d at 250.
[12] *Chester v. Grane*, 666 F.3d at 98-99; *Eisenberg v. Wellington Hall Nursing Home*, 651 F. 2d at 906; *Fuchs v. Hood Industries Inc.*, 590 F.2d 395, 397 (1st Cir. 1978); *Eisenberg v. Honeycomb Plastics*, 1987 WL 109093 *4; *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d at 250.
[13] *NLRB v. Denver Building Construction Trades Council*, 341 U.S. 675, 681-683 (1951); *Eisenberg v. Wellington Hall Nursing Home*, 651 F. 2d at 906;  *Schauffler v. Highway Truck Drivers, Local 107*, 292 F. 2d 7, 7 (3rd Cir. 1956);  *Eisenberg v. Honeycomb Plastics*, 1987 WL 109093 at *3; *Kendellen v. Evergreen America Corporation*, 428 F. Supp. 2d at 250.
[14] *Kobell v. Suburban Lines*, 731 F.2d at 1091.
[15] *Chester v. Grane*, 666 F.3d at 102; *Pascarell v. Vibra Screw*, 904 F. 2d 874, 878 (3rd Cir. 1990).
[16] *Id.* at 879

Board, acting with reasonable expedition, from exercising its ultimate remedial powers."[17] The determination that the relief sought is "just and proper" requires a finding by the court that "it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board."[18]

## IV. APPROPRIATENESS OF PROTECTIVE RESTRAINING ORDER IN THE INSTANT MATTER

### A. STATEMENT OF FACTS

#### 1. Background

Respondent, a for-profit healthcare corporation in the State of New Jersey, acquired Meadowlands Hospital Medical Center, a 231 bed community-based hospital located in Secaucus, New Jersey from Liberty Health Systems ("Predecessor") on December 7, 2010. Respondent is owned and operated by a Board of Directors consisting of Dr. Richard Lipsky, Tamara Duneav, Pavel Pogodin and Anastasia Burykul.[19] Dr. Lipsky is Chairman of Respondent's Board of Directors.

In 2009, Dr. Lipsky formed an ownership group with Duneav and Pogodin to purchase the Hospital and convert it from non-profit to a for-profit hospital. In or about January 2010, Respondent entered into an asset purchase agreement with the predecessor to acquire the Hospital. Respondent filed the necessary paperwork with the State of New Jersey's Department of Health ("NJ DOH") and Attorney General's office for approval. After a review process that included public hearings, the NJ DOH and Attorney General's office approved Respondent's purchase of the Hospital.

---

[17] *Kobell v. Suburban Lines*, 731 F.2d at 1091-92
[18] *Eisenberg v. Lenape Properties, Inc.*, 781 F.2d 999, 1003 (3rd Cir. 1986).

Prior to the acquisition of the Hospital, on September 9 and September 11, 2010, Respondent engaged in bargaining with the Health Professionals and Allied Employees, AFT, AFL-CIO ("Union"), the certified representative of the Hospital's registered nurse ("RN"), Service, and Technical unit employees.  Respondent and the Union reached agreement on separate collective bargaining agreements for the RN, Service, and Technical units and agreed to sign the agreements upon the purchase of the Hospital.  The agreements were effective from December 7, 2010 until May 31, 2016.

The parties' bargaining relationship has been contentious from the start.  The Union filed approximately 46 grievances and 16 unfair labor practice charges from December 7, 2010 until December 10, 2013 - the commencement of the underlying unfair labor practice proceedings.  Many of these disputes concerned the entire bargaining units or multiple employees.  For example, almost immediately after the purchase of the Hospital, Respondent improperly classified all employees as probationary (with a hire date of December 7, 2010) and discharged 20 employees without just cause.  On May 9, 2011, the Union filed a grievance alleging that the Respondent denied 20 unit clerks and secretaries their contractual bumping rights after those classifications were eliminated. On June 8, 2011, the Union filed a grievance alleging that Respondent failed to maintain the contractual health benefits of all Unit employees.

Moreover, the Union filed unfair labor practice charges in Cases 22-CA-29980, 22-CA-30065 and 22-CA-63233 alleging, *inter alia*, discriminatory discipline, discharge, and layoff of employees; unlawful surveillance; direct dealing; the failure to furnish information; the refusal to process grievances; the unilateral layoff of unit employees and



---

[19] The Board of Directors established an entity referred to as Complete Medical Project Management, LLC ("CMPM") which owns Respondent, and in turn, Respondent owns Meadowlands Hospital Medical Center.

transfer of unit work to non-unit positions; and the unilateral change in Union access to the facility, bumping rights, medical benefits, work policies, job descriptions, and evaluation forms.

The bargaining relationship deteriorated further after Respondent closed several hospital units, laid off employees, refused to bargain over layoff procedures, made unilateral changes to the 12-hour shift schedules, and delayed grievances in contravention of its obligation to bargain in good faith with the Union. Roughly around the same period in July 2011, Respondent began internship programs for RNs and Nurse Assistants ("NA") that effectively replaced bargaining unit RN and NA employees with interns. Such actions led the Union to engage in a publicity campaign to raise awareness of Respondent's discriminatory practices. The publicity campaign reached an apex when the Union released a white paper, featuring a comprehensive study of the Hospital's operations on October 2, 2012. After the release of the Union's white paper, Respondent responded swiftly with threats to close additional units and further trampled on employee's rights covered by the collective bargaining agreements.

As stated above, on September 30, 2013, the Region issued an Order Consolidating Cases, First Amended Consolidated Complaint and Notice of Hearing alleging, *inter alia*, that Respondent violated Section 8(a)(1) and (5) of the Act. An administrative hearing was conducted over 33 days from December 10, 2013 until May 27, 2016.

2.    Respondent Signs Asset Purchase Agreement to Sell Meadowlands Hospital Medical Center

On July 1, 2016, Respondent applied for a Certificate of Need for Hospital-Related projects with NJ DOH. A Certificate of Need from NJ DOH is required to

10

permit Respondent to transfer its license to operate the Hospital to a buyer. Respondent's application included an asset purchase agreement for the sale of the Hospital to NJMHMC. The sale price of the Hospital was set at $12.2 million, of which NJMHMC will pay $5 million immediately upon the closing of the sale, and finance the $7.2 million remainder from the current owners of the Hospital. In turn, NJMHMC will pay yearly installments of $1.3 million over the course of six years.

The asset purchase agreement further stipulates that Respondent retains control over some of the Hospital's assets, including a cancer center entity, a license to run a 30-bed rehabilitation center, a medical realty company and Elite Auto; however, it will immediately transfer full ownership of the Hospital to NJMHMC. This is troubling since in late 2012, Respondent entered into a sale-leaseback transaction with RosDev, a Canadian property developer, to sell the land on which the Hospital is located. Therefore, the Hospital constitutes an overwhelming majority of Respondent's remaining assets.

3.   Administrative Law Judge Decision Finds that Respondent Violated the Act

On September 20, 2016, Administrative Law Judge Steven Davis issued a decision in *MHA, LLC d/b/a Meadowlands Hospital Medical Center*, JD(NY)-35-16 finding that Respondent violated Section 8(a)(1) of the Act by threatening its employees with closure of its Rehabilitation Unit if employees engaged in protected activity and violated Section 8(a)(5) of the Act by (1) selecting employees to be laid off without affording the Union an opportunity to bargain; (2) assigning Service Unit work to non-unit per diem employees without prior notice and an opportunity to bargain; (3) failing and refusing to produce to the Union the DNV Inspection Report and information

11

concerning Veritas; (4) unilaterally eliminating RN and Technical Unit 12-hour shifts; (5) failing to continue in effect all the terms and conditions of the RN contract by refusing to apply the RN contract to RN interns; (6) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by refusing to make contributions to employees' 401(k) pension plan; (7) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by failing to allow Union representatives to meet with employees in the Hospital's cafeteria; (8) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by failing to offer bumping and recall rights to laid off employees; (9) failing to continue in effect all of the terms and conditions of the RN, Service, and Technical contracts by refusing to apply the Service contract to the Hospital Assistants; and (10) failing to continue in effect all of the terms and conditions of the Service contract by refusing to apply the Service contract to the Nursing Assistant interns.

### 4. Respondent's Refusal to Provide Documents or Set Aside Sufficient Funds

After the Administrative Law Judge issued his decision, Respondent notified the Petitioner that it was potentially interested in entering the Board's Alternative Dispute Resolution ("ADR") program to try to reach a resolution of liability prior to filing exceptions to the administrative law judge's decision. Even though Respondent urged the Petitioner to calculate the backpay and fringe contributions liability, it failed to provide the Petitioner with the necessary documentation to calculate the remedy, and instead placed blame on the Petitioner for the parties' inability to resolve these cases involved herein. Since Respondent has failed to provide the documentation to accurately calculate the backpay and fringe contributions liability, the Petitioner has relied on the

12

documents produced during the unfair labor practice proceedings to estimate the backpay and fringe contribution liability. At the unfair labor practice proceedings, the evidence showed that approximately 110 RN interns participated in the RN internship program ranging from several weeks to 6 months. The estimated calculation for the RN internship remedy by itself approximates 3.5 million dollars.[20]

The Petitioner has also requested that Respondent set aside assets or purchase a surety bond to meet the estimated remedy amount. However, Respondent has failed to respond, but instead it indicated that it would challenge the Union's request for 10(j) relief. By letter dated October 31, 2016, the Region sent a *Golden State Bottling Company*[21] successorship letter to NJMHMC to make it aware of its potential liability responsibilities given that Respondent violated federal labor law.

## VI.   ARGUMENT

### POINT I:   PETITIONER HAS REASONABLE CAUSE TO BELIEVE THAT RESPONDENT VIOLATED SECTION 8(a)(1) AND (5) OF THE ACT.

Section 8(a)(1) of the Act prohibits employer interference with, restraint, or coercion of employees in the exercise of the rights guaranteed in section 7 of the Act[22]

---

[20] On October 6, 2016, ALJ Davis issued an Order denying the Union's Motion to Correct, in which, it requested Judge Davis to issue an errata so that his Conclusion of Law, Remedy and Order conform to his Finding of Facts and conclusion of law that Respondent failed to adhere to the contractually required medical plan. Judge Davis admitted his omissions were "inadvertent and in error," but he indicated that, since the case had been already transferred to the Board, the motion should be addressed to the Board in its exceptions to the ALJ's decision. Since then, the Union has filed exceptions to the ALJD due to the Judge's omission of a remedy for the medical plans violations and it is waiting for a decision from the Board.

[21] *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973). In *Golden State*, the Board found that, successors who had knowledge of the unfair labor practice proceedings may be required, under the Act, to remedy the unfair labor practices by making employees whole for losses suffered as a result of an employer's unfair labor practices. It also held that the employer's liquidation of its business does not extinguish its backpay liability for unfair labor practices committed beforehand. Id. at 187 fn. 9.

[22] 29 U.S.C. § 158(a)(1). Section 7 provides: Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or

and Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse "to bargain collectively with the representative of his employees."[23]  There is reasonable cause to believe that Respondent interfered with restrained and coerced employees in the exercise of their rights under the Act by threatening Union's representative Carlton Levine and Local Union President Joanne Dudsak that if the Union went forward with the pre-scheduled October 2, 2012 press conference to release the Union's white paper that Respondent would close the Rehabilitation Unit.  Respondent's statement constitutes an unlawful threat.[24]  Courts in this district have found such allegations grounded in substantial and non-frivolous legal theories of law.[25]

Similarly, the Petitioner's belief that Respondent violated Section 8(a)(5) of the Act by failing to continue in effect all terms and conditions of the registered nurse contract by refusing to apply the contract to the registered nurse ("RN") interns; by failing to afford the Union an opportunity to bargain with Respondent with respect to the criteria to be used for selecting employees to be laid off;  by failing to afford the Union an opportunity to bargain with Respondent with respect to its assignment of work of service unit employees to non-bargaining unit per diem service unit employees; by failing to continue in effect all the terms and conditions of the registered nurse ("RN"), service and technical units contracts; by implementing new employee medical plans that were not

---

[23] 29 U.S.C. § 158(a)(5) states it is unlawful for an employer to "refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

[24] *Daikichi Corp.*, 335 NLRB 622, 624 (2001).

[25] See *Eisenberg v. Tubari*, 1985 WL 32832 (July 8, 1985 D.NJ) ("Finding reasonable cause to believe the Employer violated Section 8(a) (1) of the Act by interrogating employees, threatening employees with discharge and unspecified reprisals, soliciting employee grievances and promising better benefits and creating the impression that its employees' activities were being kept under surveillance.); *Eisenberg v. Honeycomb Plastics Corp.*, 1987 WL 109093, 125 LRRM 3257 (D.N..J. 1987).

substantially comparable to their former medical plans; by failing to continue in effect all the terms and conditions of the RN and technical unit contracts by eliminating employees' 12-hour shifts; by failing to continue in effect all the terms and conditions of the RN, service and technical unit contracts by refusing to make contributions to employees' 401(k) benefit plans; by failing to continue in effect all the terms and conditions of the RN, service and technical unit contracts by failing to allow Union representatives to meet with bargaining unit employees in the cafeteria; by failing to continue in effect all the terms and conditions of the RN, service and technical unit contracts by failing to offer bumping and recall rights to laid off employees; by failing to continue in effect all the terms and conditions of the service unit contract by refusing to apply the service unit contract to hospital assistants; by failing to continue in effect all the terms and conditions of the service unit contract by refusing to apply the service unit contract to nursing assistant interns; and by failing to bargain in good faith by refusing to provide information requested by the Union concerning the DNV Inspection Report and Veritas is based upon a substantial, non-frivolous legal theory.[26]

The Petitioner's legal theory is further supported by the administrative law judge's decision finding that Respondent violated Section 8(a)(1) and (5) of the Act. As such, this overwhelming record evidence demonstrates that there is reasonable cause to believe Respondent failed to bargain in good faith with the Union. As a consequence of Respondent's unlawful conduct, its liability is, as stated above, estimated at approximately $3.5 million.

---

[26] *Kobell v. Suburban Lines*, 731 F.2d at 1084 (3rd Cir. 1984).

## POINT II.   <u>INJUNCTIVE RELIEF IS JUST AND PROPER</u>

In the Third Circuit to establish that its requested injunctive relief is "just and proper," the Board must present evidence that the failure to grant the 10(j) injunction would "prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers." *Chester v. Grane,* 666 F.3d at 102-103; *Kobell,* 731 F.2d at 1091-1092. A §10(j) order segregating assets is therefore "just and proper" where, if no injunction is granted, there is a risk that insufficient assets would be available to satisfy a monetary remedy. District courts within the Third Circuit have issued asset segregation orders, like in *Pascarell v. Alpine Fashions,* 126 LRRM 2242 (D. N.J. 1987), and in *Kobell v. Menard Fiberglass Products,* 678 F. Supp. 1155 (W.D. Pa. 1988).

The Courts' holdings in *Pascarell v. Alpine Fashions* and *Kobell v. Menard Fiberglass Products* suggest that an employer's asset sale, with little more, creates a risk that the Board's monetary order will not be satisfied. In *Pascarell v. Alpine Fashions,* Before the sale, the employer owned a business, (a) which had been generating an income from which a monetary remedy could have been satisfied, and (b) which had included geographically fixed real estate and equipment that could have been conveniently subjected to a lien to satisfy a monetary order. After the sale, the employer only has cash, which is easily disposable and therefore subject to the risk that the employer, unless enjoined, will easily dispose of it. Consistent with this rationale, in several cases, district courts have found that Regional Directors need only minimal showings to obtain §10(j) asset segregation orders. In *Menard Fiberglass Products,* the employer was selling its business, other creditors were seeking the proceeds from the sale to satisfy the employer's debts, and the employer opposed posting a bond. 678 F. Supp. at 1163.

Nevertheless, the court relied only on a manager's testimony that the employer was selling the business assets "without providing for satisfaction of any future backpay liability." *Id.* at 1167.

Similarly, in *Schaub v. Brewery Products*, 715 F. Supp. 829, 831 (E.D. Mich. 1989), the court issued a §10(j) injunction, ruling:

> [T]he assets of respondent have apparently been sold and respondent has ceased all business operations. Under these facts, an order precluding respondent from dissipating the proceeds on the sale of its assets would preserve the status quo and prevent a frustration of the Board's final order.

Finally, in *Maram v. Alle Arecibo Corp.*, the court issued a §10(j) injunction segregating assets because the employer intended to close its business and sell its assets, while "declin[ing] to provide Petitioner [the Region] with any written assurances, either sworn or unsworn" that it would satisfy the Board's backpay judgment.[27]

Here, at the conclusion of the unfair labor practice proceedings, Respondent entered into an asset purchase agreement to sell the Hospital to NJMHMC and it has refused to respond to Petitioner's request that it voluntarily set aside or purchase a surety bond to cover the potential monetary liability in this instant matter. There is a danger that, after the sale, Respondent will disperse its assets and nothing will remain to satisfy any eventual Board order. In these circumstances, Section 10(j) relief is appropriate to require Respondent to sequester or escrow an amount of money equal to the Region's best estimate of anticipated backpay/fringe contributions, plus interest. *See generally Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940); *NLRB v. Kellburn Mfg.*, 149 F.2d 686 (2nd Cir. 1945). *See also, Schaub v. Brewery Products, Inc.*, supra; *Maram v. Alle Arecibo Corp.*, supra.

---

[27] 1982 U.S. Dist. LEXIS 13289, 110 LRRM 2495 (D. P.R. 1982), *10-11, ¶8.

Moreover, the pending sale of the Hospital is particularly troubling because Respondent has a well-documented history of favoring its principals over other creditors as evidenced from the audited financial statements for 2011, 2012 and 2013 that Respondent filed with NJ DOH. The financial reports in 2011, 2012 and 2013 refer to Complete Medical Project Management, LLC ("CMPM"). In other words, CMPM owns Respondent, which owns the Hospital. CMPM's managing members are Dr. Richard Lipsky, Tamara Dunaev and Pavel Pogodin. As of June 29, 2015, $1,935,000 in notes were payable to CMPM members. The 2011 financial statements reflect a loan from the CMPM members:

> In order to improve the Hospital's cash management processes, new bank accounts were opened on behalf of the Hospital using personal funds of a Board of Director member. Also, during 2011, this Board member purchased supplies on behalf of the Hospital. At December 31, 2011, the Hospital owed this Board member approximately $100,000, which is included in accounts payable and accrued expenses on the accompanying balance sheet.

The 2013 Audited Financial Statement further states:

> The Hospital also had unsecured loans payable at December 31, 2013 from members of CMPM amounting to $2,335,000. In January 2014, $400,000 of these notes was repaid. The remainder of the notes accrued interest at a rate of 5 percent in 2013, with interest due monthly. Principal is due upon maturity, which has not yet been established by the members.

Respondent borrowed, in March 2012, $5,000,000 from two of its directors. In late 2012, as stated *supra*, Respondent entered into a sale-leaseback transaction selling ownership of the land under the hospital for $18,000,000. Respondent used the proceeds of that transaction to pay off the amount owed on the land to its bank and the $5,000,000 loan from its directors.

This all shows Respondent's tendency to borrow from principals, suggesting that additional favored loans may exist by the sale date, but because Respondent has refused

18

to file its 2014 or 2015 financial statements it is unknown what additional loans or repayments exist. Respondent's refusal to file audited financial statements in 2014 and 2015 has resulted in fines for non-filing that, as of August 4, 2016, totaled $82,000. Moreover, Respondent has frequently been cited by the Internal Revenue Service for failing to make deposits in order to pay payroll taxes. The Internal Revenue Service filed tax liens on Respondent on March 4, 2016 for $59,313 (after a release for that amount on February 19, 2016); for $80,136 on July 10, 2015; for $197,044 on January 22, 2014; and for $2,936,381 on March 13, 2013. If Respondent has not paid these tax liens, Respondent is indebted to the Internal Revenue Service for $3,272,874, and thus, there is competing interest for Respondent's sales proceeds. Absent an appropriate protective order requiring sequestration of assets, Respondent will likely dissolve and dispose of any remaining assets by the time a Board's backpay order issues.

District Courts including in this Circuit, have recognized the need for sequestration orders in similar cases. In *Blyer v. Unitron Color Graphics of New York Inc.,* 1998 WL 1032625 (E.D.N.Y. 1998), the Court found that the employer closed its operations and entered into an asset purchase agreement in which the buyer (AGT), agreed to provide the employer with an income stream, leaving the employer with "no assets apart from the income expected from AGT." *Id.* at *2. The court issued a §10(j) injunction, finding that "it is just and proper, in order to ensure that any backpay order is meaningful, to impose injunctive relief preserving the assets of Respondent." *Id.* at *3. *See also Schaub v. Brewery Products, Inc.,* supra; *Kobell v. Menard Fiberglass Products, Inc.,* supra; *Pascarell v. Alpine Fashions, Inc.,* 126 LRRM 2242 (D. N.J. 1987); *Norton v. New Hope Industries, Inc.,* 119 LRRM 3086 (M.D. La. *1985); Aguayo v. Chamtech*

*Service Center,* 157 LRRM 2299, 2300-01 (C.D. Cal. 1997) (sequestration of assets TRO); *Jensen v. Chanitech Service Center,* 155 LRRM 2058, 2059-60 (C.D. Cal. 1997) (sequestration of assets injunction).

A sequestration of assets injunction would not be unduly burdensome to Respondent as it would not be prevented from incurring and paying current business expenses or selling any assets in arm length transactions for fair and present consideration. Rather, it would merely preclude Respondent from dissipating assets without first ensuring the preservation of sufficient funds to satisfy any potential backpay and fringe contributions liability. *See Kobell v. Menard Fiberglass,* supra at 1166-1167. *See also NLRB v. Rosedale Fabricators, LLC,* 175 LRRM 2297 (5th Cir. 2004). Accordingly, given that the balance of potential harms favors protecting the Board's remedial authority through issuance of a protective restraining order and an interim sequestration-of-assets injunction. The risk of irreparable harm to the Board's remedial authority and to the public interest in ensuring that unfair labor practices are adequately remedied is great. *See, e.g., NLRB v. Electro-Voice, Inc.,* 83 F.3d 1559, 1574 (7th Cir. 1996), *cert. denied* 519 U.S. 1055 (1997) ("the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate" a case). By contrast, as noted above the protective restraining order sought would not be unduly burdensome on the Respondent.

V.  CONCLUSION

For the reasons set forth in the petition for a protective restraining order and in the foregoing memorandum, Petitioner respectfully urges that the Court grant the relief requested in the Petition to protect the statutory rights of employees and the public

20

interest pending the final resolution of the administrative proceeding pending before the

National Labor Relations Board.

Respectfully submitted,

/s/ Saulo Santiago

Saulo Santiago
Counsel for the Petitioner
National Labor Relations Board-Region 22
20 Washington Place
Newark, New Jersey 07102